ROBERT TODD KERR AND RUTH KERR, APPEL-
LANTS, *v.* J. E. CHURCH, JR., RESPONDENT.

No. 4063

August 13, 1958.                          329 P.2d 277.

*Clyde D. Souter,* of Reno, for Appellants.

*Springmeyer & Thompson,* of Reno, for Respondent.

# OPINION

By the Court, BADT, C. J. :

This appeal is taken from a judgment in an action in equity, based upon a general verdict and upon special findings of a jury canceling and setting aside a deed executed by J. E. Church, Jr., the respondent herein, to Robert Todd Kerr, one of the two appellants. The appellants have also appealed from the court's order denying their motion for a new trial. While the general verdict, the special findings of the jury, the court's findings and conclusions and the judgment are based upon additional grounds of a fraudulent scheme to acquire respondent's property and upon false representations, we need consider only the single ground that there had been a failure of the consideration recited in the deed. We have concluded that there is substantial evidence to support the findings and judgment in this respect and that the judgment and order denying new trial must, accordingly, be affirmed.

The deed in question contained the following paragraph: "This conveyance is executed by party of the first part and accepted by party of the second part with the understanding that the property hereby conveyed with the general furnishings located therein and thereon is being transferred to party of the second part as the adoptive grandson of party of the first part at the moderate price of forty-five hundred dollars ($4500.00), by reason of the fact that said party of the second part plans to preserve the dwelling house located upon said premises in its present attractiveness and with the further understanding that said party of the first part shall be entitled during his lifetime to make joint use and have mutual enjoyment of said premises and property with said party of the second part."

This opinion deals with that part of the foregoing provisions which provides that the grantor shall be entitled during his lifetime to make joint use and have mutual enjoyment of the premises with the grantee. In this respect the jury was asked whether the defendant, Robert Todd Kerr, did promise and agree that plaintiff, during his lifetime, should be entitled to make joint use and have mutual enjoyment of said premises and property. The jury answered in the affirmative. It was then asked, "Have the defendants denied to plaintiff the joint use and mutual enjoyment of said premises and property?" and it again answered in the affirmative. The court's finding in this respect was as follows: "13. The consideration for the conveyance of said real property by plaintiff to defendant Robert Todd Kerr has substantially failed in that defendants have denied and do now deny to plaintiff the joint use and mutual enjoyment of said premises and property, and in that plaintiff has been substantially deprived by defendants of a home on the premises and has been refused by defendants the care, respect, comfort and attention which it was intended plaintiff should enjoy." The assertion of appellants that both the jury's finding and the court's finding are totally devoid of support in the evidence requires a careful analysis not only of the actions of the defendants but of the entire situation, background and relationships of the parties with reference to the property.

The property itself is residential property, fronting 100 feet on Fourth Street and 210 feet on Washington Street in the city of Reno, and contains a main residence and an additional cottage in the rear. In 1928 Dr. Church rented the cottage to Ruth Kerr and her husband Frank and their child Robert Todd Kerr. While Frank and Ruth separated in 1932, they were not divorced until 1940. From the time of their separation, Ruth and Robert Todd continued to live on the property until 1943. About that time Ruth moved to San Francisco to obtain employment and Robert entered the Merchant Marine. From 1932 till 1943 Ruth was Dr. Church's housekeeper, maintained the home for him, lived there without payment of rent, received about $10 a month for her services

and was also employed in other places. She did not live on the property for a period from the spring of 1943 until the end of May 1946. During that period a Mrs. Demarest and her daughter lived there. From September 1946 to April of 1949 Robert Todd lived there also, and during that period Dr. Church was away most of the time. While Mrs. Kerr acted as his housekeeper, their relations were most friendly and happy. Likewise for a period after her return from San Francisco in 1945. While she was living at the Colonial Apartments, their friendship maintained and they met frequently. She asked that Dr. Church take her in. Dr. Church testified that shortly thereafter Mrs. Kerr stated "that Todd needed some help to get his head above water. The war was then coming to a close . . . and so she asked me if I could not transfer the home to him so that he would feel that he had something to own. We had passed through stages in which Todd had expressed—or others for him—the deep interest in the home as a home for his life, . . . and I yielded to that on the ground that there were three or four things that might be done with the place if they all worked in together [preserving it as a park, preserving it for the University of Nevada art gallery, for use as an asset for the support of the art gallery, etc.] and so we went forward with the deed." A diary entry of April 23, 1946 read: "Ruth urges early transfer of home. She is ill with waiting . . ." A deed was presented to him without the clause providing that its execution and acceptance were with the understanding that Church have joint use and mutual enjoyment but, on advice, he rejected this and the deed was drawn and executed on April 27, 1946 containing the clause above quoted. At the same time Robert Todd Kerr executed his note for $4400, secured by a deed of trust. The note was payable on or before 20 years from date, with interest at 4 percent. Dr. Church's age was then 77. Early the following June, Robert Todd conveyed the property to himself and his mother as joint tenants.

Dr. Church described the property at the time of the conveyance. He testified that he had devoted his life to it. "We took a large lot and made it over into this park . . .

Built the barn, and then out of the barn we built the little house . . . planted every kind of shrubs and bushes and trees I thought might grow . . . cottonwood trees, ash trees, oak trees, birch trees, willows . . . its gardens, its two lakes, its lawns, its trees, its parks . . . lawns everywhere and the ivy vines over the walls . . . In other words, one of those quiet places in which you could go five rods and lose yourself and not realize that you were living in a city . . . the trees and shrubberies and lawns were in unusually good condition . . . The ponds were full of water and lilies . . . and I put it up to Todd that he would care for that place for life. He wanted it as a home, as a place to live, a place to grow up. He had been there since a little boy of five, and he hesitated and said he didn't want to promise, and that he was willing to try, and I left it that way, except that I put in the 'shall' there in the mutual use and enjoyment, which I considered as mandatory. It is the one thing that I had to tie to." Although Mike Knox, manager of the local title insurance company thought the "mutual use" clause might be difficult, Dr. Church testified further: "But on the experience that the two families had had during these years in the old home there, as well as in the other, I was willing to take a chance, and there was no doubt at all between us what that meant; we're living together." He estimated that the $4500 price was half the value. There was no down payment. There was a gentlemen's agreement that the interest be not paid so that it might accumulate for the benefit of the art gallery. The transaction was patently not an arm's length sale of real estate.

The foregoing is all background, essential to an appreciation of the construction placed by the jury and trial judge upon the language of the deed. From these facts it appears that Church was disposed to enter the transaction because of his affection for Kerr and because of his love for the home place and his aesthetic satisfaction in its beauty and his expectation that this arrangement would result in the perpetuation of the home in its present state of beauty.

The consideration as expressed, the *use* and *enjoyment* by Church, must be read in the light of the factors peculiar to this case. (1) Church's character, with its emphasis upon aesthetic values. A failure to maintain the beauty of the place which he had himself created would substantially affect his enjoyment. A refusal to permit him to continue to lavish care and attention as he saw fit to enhance and maintain or restore its beauty as he realized it, would substantially limit his right to use and enjoyment. (2) The past relations of the parties, from which the trial court read further significance into the language used, to the effect that it was the intention of the parties that Church should receive "care, respect, comfort and attention" of the same kind, character and quality as had been established during the prior relationship.

We turn to the evidence of failure of consideration; an accumulation of incidents which, under some circumstances, might well seem petty and insignificant but which the jury and trial judge might well regard as substantial in the case at bar. On Church's return to the property after an absence of some 19 months in India, South America and elsewhere, engaged in scientific work, the relations of the parties became strained in many respects. Mrs. Kerr had formerly served him with breakfast and dinner, for which he paid, but she abruptly informed him that she could not provide dinner any more but was willing to provide his breakfast. He found the lake practically dry, pictures had been removed from his room. He was very fond of an old wood and coal heating stove. This was removed and a gas stove substituted which failed to keep the house "steadily warm." He was given the strong impression that the house was being run by Mrs. Kerr and that he should keep out. He strongly felt the prohibition of control. He was frustrated in his desire to put in a line fence along the garden and pond to have a background for the vines that were growing before that on the high board fence. Mrs. Kerr insisted that a bit of loose wire

would suffice and he let the matter go. He was not permitted to carry out his plans to repair two pew-like seats on the little raised brick porch at the front door of the small house. In refusing permission to fix the porch, Mrs. Kerr said that "there ought to be only one master on the place, and she felt that since the deed has been transferred to them that of course she should be the master." He was denied permission to repair the front door. The north parking had been left unwatered for a year and a half. Mrs. Kerr objected to his purchase of a long hose to soak it up. He purchased a 50-foot sprinkler to cover a large portion of the ground with only a little moving. "That was not satisfactory to Ruth and Ruth insisted that I dispose of it. In other words, I was headed at nearly every turn I made to improve the place . . . There was an Oregon grape, two Oregon grapes, in front of the door and they were getting pretty crowded by the grass, and they needed a little spading, they needed a little fertilizer and so on. I didn't dare ask for it. And the smaller of those two has finally died out and disappeared." When asked about a large birch tree that he had planted, he answered: "I had got so I didn't go into the back yard at all." He noticed that the birch tree was wilting and bought fertilizer for it but was not permitted to use it. He purchased four roots of yellow roses to fill in a bare space but Mrs. Kerr refused to let him plant them. The lily ponds "became a dry hole that was being gradually filled up" and it developed that it was Mrs. Kerr's intention to level the whole place and obliterate the lake entirely. "When I came back Todd told me that he thought I wasn't returning again, and therefore I guess that the whole place was on their hands to do with as they pleased; and the little garden—a tiny lake, which doesn't matter so much, was completely filled, and the hedge was all cut out in order to make a place for the garage, I think, below." Many of the plants around the lake did not survive. On one occasion he left an electric heater on in his bed when he was called to the telephone. He "found Todd thoroughly exasperated at my act and he told me that I should leave the home except—or at least during the winter. Then Todd told

me that he felt his mother had put in so much time in mowing the lawn on the place and had purchased groceries so carefully—and she does—that they ought to have the place given to them outright."

During the past five or six years the conditions were such that his normal routine was to get up in the morning, get his breakfast, get away and stay until time to return and retire. He had to abandon his habit of taking a hot bath every morning. The only bath water available later was cold. When he attempted to discuss the matter with Mrs. Kerr, her answer was "negative."

It is our opinion that the jury could have concluded that the foreclosing of any rights to administration or control of the property by the plaintiff, the cold and callous disregard of one suggestion after another on his part, the balking of all of his attempts to care for and improve the property, the expression of views of the defendants that they were the masters and in full control, all taken together in view of the former relationship of the parties and the former history of the property, could rightfully, in the judgment of the jury, be considered a serious breach of the covenant that Dr. Church should be entitled during his lifetime to make joint use and have mutual enjoyment of the premises. Certainly if the plaintiff had been subjected to blows and similar abuse while attempting to occupy the premises, it could not be logically asserted that such treatment was not a breach of that covenant. We consider the situation as described by him as differing only in degree from his being subjected to blows. This court said in an early divorce case that there may be extreme cruelty without the slightest violence, and referred to that more refined brutality which inflicts its violence upon the mind. Reed v. Reed, 4 Nev. 395 (Vol. 3–4 836). We note that not only did the court follow the advisory verdict and special findings but made its own similar findings and denied the motion for new trial.

In recognition of the equitable nature of the action and the conditions attaching to the equitable relief granted, the court ordered payment by plaintiff to defendants of the sums of $600 and $1659.53 on account,

respectively, of principal and interest on the note. It found further that though defendants had paid out $1295.40 for repairs and had paid the taxes, these disbursements had been outweighed by the value of their use of the main dwelling house and the cottage and by their receipt of more than $4000 in rentals, and that no further accounting should be required. These provisions were in order.

We conclude that the findings and judgment find substantial support in the evidence and that this assignment of error is not well taken. As above noted, we accordingly find it unnecessary to pass upon appellants' assignments that the findings of conspiracy and fraudulent representations are without support.

Appellants further contend that plaintiff's action is barred by the statute of limitations. NRS 11.080 provides: "No action for the recovery of real property, or for the recovery of possession thereof . . . shall be maintained, unless it appear that the plaintiff, his ancestor, predecessor, or grantor was seized or possessed of the premises in question, within 5 years before the commencement thereof." The deed in question was executed by respondent April 27, 1946. His action to set aside the conveyance was commenced May 5, 1955—beyond the period of limitations if the statute is applicable. It was, however, recently held in the case of Cella v. Cosgro, 115 Cal.App.2d 816, 253 P.2d 57, involving a similar statute and under facts fairly closely corresponding with the present case, that this statutory prohibition is limited to cases which involve the features of an action in ejectment or to quiet title and has no application to an action seeking to nullify the act procured by fraud or mistake. And see Lewis v. Beeks, 88 Cal.App.2d 511, 199 P.2d 413, and Murphy v. Crowley, 140 Cal. 141, 73 P. 820, therein cited. Here plaintiff sought to nullify his deed on account of fraud and failure of consideration, and although the court found in favor of both of these points, our affirmance is restricted to the latter. We consider it nonetheless directly within the rule applied

in the California cases. It additionally appears here that the present action was neither for the recovery of the property or the recovery of the possession thereof, as respondent, under the very terms of the 1946 deed, retained joint possession and was in such possession up to the very time when he commenced his action to set such deed aside. We, accordingly, find no error in the action of the court denying the two motions to dismiss based upon this ground.

Affirmed with costs.

EATHER and MERRILL, JJ., concur.